## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                :

CERVANDO S.,[1]              :           CASE NO. 3:23-CV-00987 (MPS)
*Plaintiff,*         :

                :

V.                   :

                :

MARTIN O'MALLEY,[2]    :
COMMISSIONER OF SOCIAL   :
SECURITY,           :
*Defendant.*        :

                :          DATE: AUGUST 5, 2024

                :
------------------------------------------------------- x

## RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

       This is an administrative appeal following the denial of the plaintiff's applications for

supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("the

Act").[3]  It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[4]

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action, he named then-Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, as the defendant. (*See* Doc. No. 1).  On December 20, 2023, Martin O'Malley was appointed as Commissioner of the Social Security Administration.  As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this matter.

[3] "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but require a finding of disability.  *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013); *see* 42 U.S.C. § 1382(a).

[4] Under the Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is

The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner").  (Doc. No. 18, Mot. Reverse).  In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings.  (*Id.*).  The Commissioner, in turn, has moved for an order affirming his decision.  (Doc No. 22, Mot. Affirm).

For the following reasons, the Court respectfully recommends the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED in part and DENIED in part,**[5] and the Commissioner's motion for an order affirming that decision is **DENIED**.

## I.    <u>PROCEDURAL HISTORY</u>

On July 1, 2019, the plaintiff applied for SSI benefits, claiming that he had been disabled since April 1, 2015.  (Doc. No. 11, Certified Transcript of Administrative Proceedings, dated 9/20/23 ["Tr."] 351–59).[6]    The plaintiff's application was denied initially and upon reconsideration.  (Tr. 15).  On April 15, 2022, Administrative Law Judge ("ALJ") John T. Molleur held a hearing during which the plaintiff and a vocational expert testified.  (Tr. 45).  The ALJ issued an unfavorable decision denying the plaintiff SSI benefits two weeks later.  (Tr. 9–31).  On

---

delegated to an administrative law judge ("ALJ").  *See* 20 C.F.R. §§ 404.929, 416.1429.  The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council.  *See* 20 C.F.R. §§ 404.967, 416.1467.  If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court.  Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

[5]  The Court recommends granting the plaintiff's motion to remand the case for further administrative proceedings but denying with respect to the plaintiff's request for a remand for the calculation and award of benefits.

[6]  In the initial application, which the plaintiff filed *pro se*, he alleged the onset date was April 1, 2015.  (*See* Tr. 15.)  During the ALJ's hearing, *infra*, the plaintiff's counsel stipulated that the onset date was July 1, 2019.  (Tr. 50.)

June 2, 2023, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1–8).

On July 25, 2023, the plaintiff filed his complaint in this pending action.  (Doc. No. 1, Compl.).  This case was referred to the undersigned for all purposes including issuing a recommended ruling.  (*See* Doc. No. 10, Referral Order).  On November 27, 2023, the plaintiff filed his Motion to Reverse the Decision of the Commissioner with a memorandum of law. (Mot. Reverse & Doc. No. 18-1, Pl.'s Mem.).  After receiving one extension, the Commissioner filed his Motion to Affirm and memorandum of law on January 25, 2024.  (Mot. Affirm & Doc. No. 22-1, Def.'s Mem.).  The plaintiff did not file a reply.

## II.  **FACTUAL BACKGROUND**

The medical record demonstrates that the plaintiff suffers from the following relevant medical conditions: anxiety, depression, panic attacks, post-traumatic stress disorder ("PTSD"), substance use disorder, and hepatitis C.  The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts.  (*See* Pl.'s Mem. at 3–12).  The Court cites only the portions of the record that are necessary to explain this decision.

During agency proceedings, the plaintiff's counsel objected to several exhibits during the hearing.  First, counsel objected to Exhibit 1F on the grounds that medical records predating July 1, 2019, were not relevant.  (Tr. 50).  Second, counsel objected to Exhibit 1A—state agency consultant Kelly Rogers' Disability Determination Explanation—on the ground that it was issued on July 9, 2019, and likely considered medical records prior to July 1, 2019.  (Tr. 52).  Third, counsel objected to state agency consultant Pamela Fadakar's Disability Determination Explanation (Exhibit 3A) on two grounds: (a) it was not an independent decision because it was

identical to Dr. Rogers' assessment, and (b) it was based on an incomplete medical record.  (Tr. 53–54).  The ALJ noted the objections but allowed the evidence.  (Tr. 54).

## A.    <u>Medical Opinions</u>

The medical opinions relevant to this case concern the plaintiff's treating provider Mary Lindsay Powell, DNP, APRN and state agency consultants Kelly Rogers, PhD and Pamela Fadakar, PsyD who both completed the mental health portions of the Disability Determination Examinations at the Initial and Reconsideration stages, respectively.

On July 9, 2019—eight days after the stipulated onset date—Rogers assessed the plaintiff's mental health records, which ranged from June 2015 through June 18, 2019.  (Tr. 89–96).  The Disability Determination Examination's section summarizing the record evidence documented the plaintiff's struggle with opioid use, indicated that the plaintiff "denied panic attacks" with "mild paranoia" in 2018, and noted that his anxiety had increased by June 18, 2019.  (Tr. 89–90).  Rogers also indicated that the plaintiff was looking for work in June 2019.  (Tr. 91).  With respect to workplace limitations, Rogers concluded the following about the plaintiff:

- Low mood, anxiety and intrusive thoughts tend to distract him.  Low mood/energy, reduced frustration tolerance and anxious hyperreactivity provide discontinuities in work rate and effort.  He remains able to perform simple tasks of 1–2 elements over the course of a normal work week, meeting minimum production requirements.  (Tr. 94).

- Anxious and reactive, sometimes Dysphoric, he is not ideally suited to work that requires proactive engagement of the public, but he can negotiate routing/brief exchanges and cooperate with others in the aforementioned simple work."  (*Id.*).

At the end of the report, Rogers summarized her assessment of the plaintiff's ability to work:

> Your condition results in some limitations in your ability to perform work related activities.  We have determined that your condition is not severe enough to keep you from working.  We considered the medical and other information, your age and education in determining how your condition affects your ability to work.  We do not have sufficient vocational information to determine whether you can perform any of your past relevant work.  However, based on the evidence we in file, we have determined that you can adjust to other work.

(Tr. 96).  With this finding, Rogers concluded that he was not disabled.  (Tr. 95).

On November 25, 2019, Fadakar evaluated the plaintiff's medical records, ranging from June 2015 to October 9, 2019.  (Tr. 98–108).  At this reconsideration stage, Fadakar noted that the plaintiff alleged his "depression is worse," that he was "more isolative" and tried "to avoid running into people who may trigger relapse," and that he has "higher anxiety."  (Tr. 104).  Fadakar concluded that the record "does not support worsening as alleged, but rather continuation of longstanding issues."  (*Id.*).  She also documented the same workplace limitations with the exact same language that Rogers used.  As with Rogers, Fadakar concluded that the plaintiff was not disabled, using identical language as Rogers in the explanation of why the claimant could "adjust to other work."  (Tr. 108).

On April 13, 2022—two days before the ALJ hearing—the plaintiff's treating psychiatric nurse Lindsay Powell completed a Mental Residual Functional Capacity Questionnaire.  (Tr. 1365–1373).  In the questionnaire, she stated that she had been seeing the plaintiff approximately every two weeks since June 2016.  (Tr. 1365).  The diagnoses she listed included "severe recurrent depression with psychotic [sic]," opioid use disorder, agoraphobia, and auditory hallucinations.[7] (*Id.*).  She explained his prognosis constituted a "chronic illness" that would "wax and wane." (*Id.*).

When prompted to opine on the plaintiff's ability to work, Powell indicated that he had an overall Extreme limitation.  The work-related questions were broken down into three main categories—(I) Understanding and Memory, (II) Sustained Concentration and Persistence, and (III) Social Interaction—with potential scores (in order of least severe to most severe) of None,

---

[7] Nurse Powell's handwriting is difficult to discern and, in some parts, unintelligible.  The Court includes the information it can decipher.

Mild, Moderate, Marked and Extreme.  Generally, Powell gave the plaintiff a range of scores between Mild and Extreme.  (Tr. 1368–69).  She gave the plaintiff Extreme limitations in the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- The ability to sustain an ordinary routine without special supervision;

- The ability to work in coordination with or proximity to others without being distracted by them.

- The ability to interact appropriately with the general public.

(*Id.*).  Powell also indicated that the plaintiff would need unscheduled breaks during a workday and would likely be absent more than four days per month as a result of his impairments or therapy.  (Tr. 1371).  She also indicated that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," as evidence by his hospitalization within that year.  (*Id.*).

## B.    <u>The Plaintiff's Hearing Testimony</u>

The plaintiff testified before the ALJ on April 15, 2022.  (Tr. 47).  The plaintiff's preferred language is Spanish (although he testified in English), and he stopped his education after completing the seventh grade.  (Tr. 58, 62).  He testified that his last job as a dishwasher ended in 2019 after a little over one month.  (Tr. 61).  Specifically, the plaintiff stopped going to work due to his anxiety, testifying, "People were like reading my mind and feeling uncomfortable."  (*Id.*).  With help from his case worker at the Connection (who he saw weekly), he received housing assistance, food stamps, and cash assistance.  (*Id.* at 61–63).

Since 2016, the plaintiff had been seeing Powell, who managed his medication for panic attacks, anxiety, depression, and paranoia.  (Tr. 64, 67).  When asked about the frequency and reason for his visits, the plaintiff testified that he saw Powell once or twice a month, stating,

"Because I don't feel well and I need my medication to work." (*Id.*). He had negative side effects from medication in the past, including swollen feet and shakiness. (Tr. 68). The plaintiff had a history of drug use and relapsed on occasion. (Tr. 74–76).

The ALJ asked the plaintiff to describe his symptoms. With respect to anxiety, the plaintiff testified: "I feel like when I'm around people, I feel like people can read my mind. I feel ashamed. I'm nervous, like if people going to hurt me." (Tr. 64.) Sometimes the plaintiff's anxiety caused him to eat too much. (Tr. 66.) As for his panic attacks, he testified, "I get nervous and I start [to] run." (Tr. 69). The plaintiff also testified, "Like all the time I feel like shame and I feel like people can read my mind and through my eyes all the time, and I try to take back the end of my hair. I can't." (*Id.*). He explained that his PTSD derived from incidents in the past where people jumped him while he was walking down the street. (Tr. 70). The plaintiff claimed to hear and "feel" voices—when this is the case, he calls 911 and goes to the hospital out of fear of self-harm. (Tr. 71–72). He said he was forgetful and had difficulty remembering things. (Tr. 71).

The plaintiff testified about his ability to leave the house. Some days, the plaintiff would wake up unhappy, get dressed, become nervous, and have a panic attack. (Tr. 72). When this was the case, he could not leave the house. (*Id.*). He testified that he socialized with his uncle about once a month, but he could not socialize with anyone else. (*Id.* 64–65). He also testified that he left the house about once a month to go to his medical appointments and food shopping. (Tr. 65). Though he used to go to the library once a week, he had not been able to go in over a year. (Tr. 70). Instead, he would watch television all day and eat. (*Id.*).

The ALJ asked the plaintiff to opine about daily task completion. He did not have difficulty with personal grooming, bathing and showering, laundry, or cleaning the house. (Tr. 73). However, when asked whether he needed "reminders to do things," the plaintiff testified, "[if] I'm

7

going to do something, you need to tell me what to do, and every time I'm going to do something new, you need to show me and you need to tell me because I don't understand."  (Tr. 74).

C.    **The Vocational Expert's Testimony**

The ALJ presented several hypotheticals to Vocational Expert Edmond Calandra.  The ALJ asked Calandra to opine about the possible substantial gainful activity with the following assumption: the person would have the plaintiff's age, education, lack of work history, and capability of working at all exertional levels.  (Tr. 77).

First, the ALJ asked the ALJ to opine on the jobs that would be available if the person's work (1) could "involve only brief and incidental contact with members of the general public;" (2) "must avoid tandem or other team-oriented work;" (3) would involve "no more than occasional decision-making or changes in the work setting;" and (4) "be restricted to simple, routine, repetitive tasks only."  (Tr. 77–78).  Calandra opined that such  person could work as a cleaner, hand packer, and kitchen worker / helper.  (Tr. 78).  When the ALJ altered the work restriction to (1) no requirements for interacting with the public, (2) avoiding fast-paced production work, and (3) only occasional interactions with coworkers or supervisors, Calandra responded that the same jobs would still be available.  (*Id.*).

Next, the ALJ asked Calandra to assume the person required "unscheduled breaks totaling approximately 60 to 90 minutes" per day (beyond scheduled breaks) because of anxiety, medication side effects, panic attacks, and other complications.  (*Id.*).  Calandra testified that no jobs would be available with that restriction.  (Tr. 78–79).  Calandra had the same response when the ALJ asked whether a person could do the work but be absent two to three days per month.  (Tr. 79).  Calandra specified that an acceptable amount of absence would not exceed eight hours in one month.  (*Id.*).

The plaintiff's counsel also asked Calandra two hypotheticals. First, she inquired as to what jobs would be available if an individual in a "simple, unskilled job" needed three to four reminders to stay on task each day. (Tr. 80). Calandra responded that a person would be terminated if they needed even one or two reminders per day. (Tr. 81). Second, she asked what jobs would be available for a person who could not work in coordination or in proximity to others. (Tr. 82). Calandra testified that a person who could not "be in proximity, even for involvement with coworkers," would not be able to maintain substantial gainful employment. (*Id.*).

## III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA"). *See* 20 C.F.R. § 404.1520(a).[8]

---

[8] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date July 1, 2019. (Tr. 15, 18). At step two, the ALJ determined that the plaintiff had the following severe impairments: PTSD, opioid use disorder, cannabis use disorder, anxiety disorder with a history of panic attacks, and depression. (Tr. 18). The ALJ also found that the plaintiff's history of hepatitis C constituted a non-severe impairment. (Tr. 18–19).

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 19). In doing so, the ALJ considered Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorder) and 12.15 (trauma- and stress-related disorders) under the criteria from paragraphs B and C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. With respect to the paragraph B criteria, the ALJ found the plaintiff had "moderate limitations" in all four categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) ability to concentrate, persistent, or maintain pace; and (4) the ability to adapt or manage. (Tr. 19–20). As for the paragraph C criteria, the ALJ listed the requirements under paragraph C and the summarily concluded that the "record does not show" the plaintiff satisfied the criteria.[9] (Tr. 20).

Next, the ALJ formulated the plaintiff's residual functional capacity ("RFC"). A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the

---

[9] As the ALJ explained, the paragraph C criteria is satisfied when the mental health symptoms are "sufficiently serious," i.e., there is sufficient medical history of the disorder(s) over the last two years *and* there is evidence of (1) "Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and diminishes the symptoms and signs of your mental disorder;" *and* "(2) Marginal adjustment, that is, you have a minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00G(2)(B).

relevant evidence.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ determined that the plaintiff had the residual functional capacity to perform:

> A full range of work at all exertional levels but with the following nonexertional limitations: The claimant can tolerate no mor[e] than brief and incidental contact with the general public.  He must avoid tandem or other team-oriented work, and work activities should involve no more than occasional and basic decision making or changes in the work setting.  The claimant should be restricted to simple, routine, repetitive tasks.

(Tr. 20–21).  The ALJ considered the plaintiff's hearing testimony, concluding that the "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but finding that the testimony "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 21–22).  The ALJ also considered the medical opinion from Powell, finding, in relevant part, that her opinion regarding the plaintiff's extreme and marked limitations "is not persuasive, as it is inconsistent with the claimant's generally intact mental status examinations, his ability to live alone, perform his activities of daily living independently, and his ability to access community resources such as the library." (Tr. 24).  In contrast, he found that the state agency psychological consultants were "somewhat persuasive," explaining that their evaluations were not inconsistent with the large volume of evidence that came in after reconsideration.  (*Id.*).

At step four, the ALJ found that the plaintiff did not have any past relevant work.  (*Id.*). The ALJ finished with step five.  Based on the testimony of the vocational expert, the ALJ found that the plaintiff could perform the work of a janitor, hand packer, and kitchen helper. (Tr. 25–26). Given this finding, the ALJ found that plaintiff was not disabled from July 1, 2019, his alleged onset date, to May 4, 2022, the date of the decision.  (Tr. 26).

IV.    **STANDARD OF REVIEW**

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)).  Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y. Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*.  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

V.    **DISCUSSION**

The plaintiff's raises two related arguments in this appeal: (1) the ALJ failed to properly consider the medical opinions of the plaintiff's treating psychiatric nurse and two state agency consultants, including by substituting his own opinion instead of relying on substantial evidence in the record of the plaintiff's nonexertional limitations; and (2) the ALJ's RFC determination improperly failed to include certain, supported nonexertional limitations.  (Pl.'s Mem. at 14–21). The Commissioner disagrees, arguing that (1) the ALJ properly weighed the medical opinions; and (2) the RFC he determined was supported by substantial evidence.  (*See* Def.'s Mem. at 13).

Because the Court finds that remand is warranted to re-evaluate the medical opinions, the Court will only address those additional arguments that are necessary to provide guidance to the ALJ on remand.  In particular, the Court agrees with the plaintiff's first argument and concludes that the ALJ's evaluations of the medical opinions are not supported by substantial evidence.  The Court does not assess the plaintiff's second argument, because the RFC is dependent on a proper evaluation of the medical opinions and will therefore need to be re-evaluated on remand.[10]

A.    **Medical Opinion Evidence**

The plaintiff first argues that the ALJ's assessment of the medical opinion evidence is not supported by substantial evidence.  (*See* Pl.'s Mem.  at 15–19).  Specifically, the plaintiff argues that his treating psychiatric nurse and the consultants determined he had more severe limitations than the ALJ adopted.  (*See id.* at 16–17).  The plaintiff also contends that the ALJ misstated the record in evaluating the medical opinions.  (*See id.* at 17–18).

---

[10] While the Court does not address the ALJ's RFC assessment in this recommended ruling, it notes that the ALJ did not account for limitations that are clearly apparent from the medical evidence, such as the plaintiff's need to be limited to simple tasks involving one to two elements, his limitations concerning interacting with people other than a small group of family and friends, and his need to be off-task as a result of his mental health symptoms.

The Commissioner disagrees.  He generally argues that the plaintiff's dissatisfaction with the ALJ's interpretation of the evidence is not a basis for remanding the case.  (*See* Def.'s Mem. at 12).  With respect to the applicable regulations, the Commissioner argues that the ALJ need not defer to, or even rely on, medical source opinions when determining the RFC.  (*See id.* at 8–10).  Rather, it is the ALJ's role to determine the RFC and need only consider medical opinions along with other evidence like "raw medical findings."  (*Id.*).  As for the ALJ's assessment of the facts, the Commissioner summarizes the medical opinions from Powell, Rogers, and Fadakar; states why the record supports the ALJ's findings; and then argues it is the ALJ's role to resolve conflicts between medical opinions and objective medical evidence.  (*See id.* at 4–5, 7–8, 11).

A "medical opinion" is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions," including, in relevant part, a plaintiff's "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting."  20 C.F.R. § 416.913(a)(2)(i).

Section 416.920c of Title 20 of the Code of Federal Regulations sets forth the parameters an ALJ must follow when evaluating the persuasiveness of a medical opinion or prior administrative medical finding.  The Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a).  Instead, the ALJ evaluates the medical opinions by applying the five factors listed in 20 C.F.R. §§ 416.920c(c)(1)–(c)(5).  These factors are: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factors.

Of these factors, supportability and consistency are the most important, and an ALJ must explicitly articulate how he considered them. *See* 20 C.F.R. § 416.920c(b)(2). When considering "supportability," an ALJ is expected to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)." 20 C.F.R. § 416.920c(c)(1). The "consistency" factor relates to an opinion's consistency with other evidence in the record. "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). An ALJ may explain how he considered the other three factors, but he is not required to do so. *See* 20 C.F.R. § 416.920c(b)(2).

### 1.    Consultants' Medical Opinions

In the social security context, evidence is generally defined as "anything you or anyone else submits to us or that we obtain that relates to your claim," subject to certain enumerated categories. 20 C.F.R. § 416.913(a). The Commissioner has a duty to develop a "complete medical history" and will gather records at least 12 months prior to the application date with the following caveat: "If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier." 20 C.F.R. § 416.912(b)(1)(ii). In other words, the presumptive relevant time period is the same month the disability begins.

Here, the relevant time period shifted during the application process. As a brief background, when the plaintiff initially applied for SSI benefits on July 1, 2019, he did so *pro se* and claimed he had been disabled since April 1, 2015. (Tr. 351). Two consultants evaluated the

plaintiff in 2019: Kelly Rogers on July 9 and Pamela Fadakar on November 25. (Tr. 94, 104). The plaintiff was appointed counsel in February 2020. (*See* Tr. 127.) At the hearing in April 2022, the plaintiff stipulated that the appropriate onset date should be July 1, 2019. (Tr. 50).

Because of the plaintiff's stipulation, the relevant time period started on July 1, 2019. *See New v. O'Malley*, No. 23-643-cv, 2024 WL 1266412, at *2 (2d Cir. 2024) (summary order) (explaining the "relevant period" begins with the onset date); *see generally* 20 C.F.R. § 416.912(b)(1)(ii). The record indicates that Rogers reviewed medical evidence ranging from June 2015 through June 18, 2019, and Fadakar reviewed the same mental health evidence with only one addition from October 2019. (Tr. 90 (Rogers: "On his last visit in file of June 18, 2019, he had a higher degree of anx and propranolol was changed to qd.") & 102 (Fadakar: "10/09/19 – YNHH psych eval – MSE: cooperative, speech wnl, mood good, affect congruent, TP organized, TC normal, denies SI/HI."). In other words, the record available to Rogers turned out to be entirely irrelevant, and Fadakar's only relevant record is from one visit within the first four months of the onset date.

The ALJ nonetheless found the consultants "somewhat persuasive," explaining: "there is a large volume of evidence that has come in after reconsideration and the undersigned does not find the State agency evaluations to be inconsistent with the later evidence, which provides a significant amount of narrative and frequent mental status examinations." (Tr. 24). It is not uncommon for medical records to be supplemented after the consultants complete their reports, and this fact alone does not render the examinations "unpersuasive." *See* 20 C.F.R. § 416.920c(c)(5). But the consultative examination must still be based on relevant evidence, at least to some degree. After all, if "medical opinion evidence" is any "statement from a medical source about what [the claimant] can do *despite [their] impairment(s)* and whether [they] have one or more impairment-

16

related limitations or restrictions," 20 C.F.R. § 416.913(a)(2) (emphasis added), the medical opinion is only relevant if it relates to the claimant's limitations *after* onset of the disability. By finding the consultants to be "somewhat persuasive," the ALJ considered evidence that predated the onset date—meaning, the ALJ considered evidence that would tend to show the plaintiff was *not* disabled. Put another way, the ALJ formulated his own opinion about the record and then used irrelevant evidence as support for his conclusion. This is impermissible. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d. Cir. 2019) (explaining an ALJ decision must be supported by substantial evidence); *Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, at *10 (2d Cir. 2020) (cautioning ALJs from drawing their own conclusions about isolated evidence).

## 2.    Nurse Powell's Medical Opinion

The record in this case contains medical evidence from only one treating provider: Lindsay Powell, who treated the plaintiff for his mental health needs since 2016. The ALJ concluded that Powell was "not persuasive." (Tr. 24). With respect to the "supportability" factor, the ALJ did not assess Powell's entire medical source statement but instead only discussed the GAF scores, which were two lines of the seven-page assessment. The ALJ found the objective medical evidence did not support Powell giving the plaintiff a GAF score of 20 ("some danger of hurting self or others") and 40 ("some impairment in reality testing or communication"), explaining that the plaintiff's mental status examinations were either "mildly abnormal" or "normal" and the plaintiff was able to go to the library. (Tr. 24 (citing Ex. 7F at 25, 13F at 18, 14F at 3).) As for the "credibility" factor, the ALJ concluded Powell's determination that the plaintiff had "marked to extreme limitations in mental function" was "inconsistent with the claimant's generally intact mental status examinations, his ability to live alone, perform his activities of daily living independently, and his ability to access community resources such as the library." (*Id.*). The ALJ

also concluded the plaintiff's hospitalization in January 2022 was inconsistent with Powell's description that he was in remission (presumably because the medical records indicated he had relapsed). (*Id.*). The ALJ did not discuss the other three factors. *See* 20 C.F.R. §§ 416.920c(c)(3)–(5) (relationship with the claimant, provider's specialization, and any other factors).

When reviewing an ALJ's evaluation of a medical opinion, the court must strike a careful balance. On the one hand, a reviewing court may not "decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner." *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *6 n.12 (D. Conn. Nov. 16, 2021); *see also Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) ("The Commissioner retains the discretion to reach a conclusion inconsistent with an opinion of a treating physician where that conclusion is supported by sufficient contradictory evidence."). On the other hand, the Commissioner does not have unbridled discretion to cherry-pick evidence that supports his desired outcome. *See Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).

"Cherry-picking can be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Id.* (citation and internal quotation marks omitted). It "can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (citation and internal quotation marks omitted). The Second Circuit has repeatedly taken note of "cherry picking" as a factor in demonstrating error. *See Estrella*, 925 F.3d at 97 (opining that "the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing" a treating physicians opinion under the earlier regulations) (citation omitted); *Rucker v. Kijakazi*, 48 F.4th 86, 94 (2d Cir. 2022) (opining that "it was not permissible for the ALJ to 'cherry-pick[ ]' the

positive aspects of the progress reports to discount [the treating psychiatrist's] opinion as unsupported by the evidence") (citing *Estrella*, 925 F.3d at 97).

The Court begins with the ALJ's "supportability" explanation. As an initial matter, a GAF score is supposed to be given "little weight" unless the provider clearly explains it. *See Estrella*, 925 F.3d at 97 (citing U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014)); *see* A. Psych. Ass'n*, Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) at Introduction ("DSM-IV Axis V consisted of the Global Assessment of Functioning (GAF) scale, representing the clinician's judgment of the individual's overall level of 'functioning on a hypothetical continuum of mental health-illness.'  It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.").  Because Powell did not explain the GAF score, the ALJ should not have relied on this single piece of evidence to evaluate supportability.

In any event, Powell's GAF scores are supported by the objective medical evidence. Powell's GAF score of 20 indicates that the plaintiff has "some danger of hurting self or others," (Tr. 24), and the objective medical evidence indicates that the plaintiff was hospitalized for suicidal ideation with a plan less than three months before Powell completed the questionnaire.  (Tr. 1325). Even Powell's other GAF score of 40—which (as the ALJ noted) indicates "some impairment in reality testing or communication," (Tr. 24)— is supported as the objective medical evidence shows an extensive history of delusions as well as evidence of auditory hallucinations and paranoia, (Tr. 871, 1066, 1160, 1168, 1184, 1188, 1209, 1308, 1326, 1333, 1335, 1346, 1349, 1358).  The Court has reviewed the ALJ's citation to three pages of medical evidence—which the ALJ describes as

showing "mildly abnormal status" and "normal mental status" and evidence the plaintiff was capable of going to the library, (*see* Tr. 1064, 1259 & 1299 (Ex. 7F at 25, 13F at 18, 14F at 3, respectively))—and finds that it does not conflict with Powell's findings that he has "severe recurrent depression with psychotic [episodes]" and "auditory hallucinations." (Tr. 1365). Moreover, the ALJ completely ignored the other, more substantive aspects of Powell's evaluation: the plaintiff's diagnoses, symptoms, and work-related limitations. The ALJ's failure to explain whether these aspects of Powell's medical opinion are supported by objective medical evidence is error. *See* 20 C.F.R. § 416.920c(b)(2), (c)(1).

Moving on to the ALJ's "credibility" assessment, the ALJ found the plaintiff could not have had "marked to extreme limitations," as Powell indicated in some instances, because such findings were "inconsistent with the claimant's generally intact mental status examinations, his ability to live alone, perform his activities of daily living independently, and his ability to access community resources such as the library." (Tr. 24). The ALJ also found Powell's note that the plaintiff's substance abuse was in remission conflicted with the evidence that he was hospitalized from January to February 2022, in part because of a relapse. (*Id.*).

When it comes to chronic conditions—as is the case with the plaintiff's mental health—the Second Circuit explained the importance of assessing the *record as a whole* in *Estrella v. Berryhill*, a case involving a claimant with major depressive disorder, bipolar disorder, and ADHD where the ALJ assigned the treating physician "little weight."[11] 925 F.3d at 94–95. The Second

_____

[11] The Court notes that the now-defunct treating physician rule applied in *Estrella v. Berryhill*. The fact that a treating physician is no longer entitled to deference has no bearing on the fact that an ALJ must still consider the record as a whole in evaluating the persuasiveness of a medical opinion. *See Faure v. Comm'r of Soc. Sec.*, 685 F. Supp. 3d 247, 262 (S.D.N.Y. 2023) (applying *Estrella* analysis to the post-treating physician procedure); *Carasue R. v. O'Malley*, No. 1:23-CV-775 (BKS/MJK), 2024 WL 1641582, at *6 (N.D.N.Y. Mar. 18, 2024) (same).

Circuit explained that an ALJ must consider "the apparent longitudinal inconsistencies in [the claimant's] mental health," *id.* at 97, quoting the following from the Ninth Circuit: "Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working," *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014).

Here, the plaintiff's medical records show that his symptoms vacillated over months and years. For example, in August 2019, the plaintiff reported isolating himself in his home for fear of relapse and feeling stress that made it "more difficult to cope with everyday living." (Tr. 846). In January 2020—one of the three visits cited by the ALJ purportedly showing "normal" or "mildly abnormal" mental status—the medical record indicates:

> Today, patient states his anxiety has been bad for the last month. He rarely leaves his apartment except when a friend gets him out to shop, or he visits the library. States panic comes in short bursts, especially in the afternoon. . . . States mood has been low because of family difficulties. His daughter is not talking to him at this time which causes distress and rumination.

(Tr. 1064 (1/8/20)). Yet in March 2020, the plaintiff's mental health improved insofar as he reported his medication was working well, his panic attacks were managed, his symptoms were stable, and he could socialize with his brother. (Tr. 1073). Then in May and July 2020, the plaintiff's symptoms worsened, and he reported delusions where "people can read his thoughts" and "extreme anxiety and panic in public places and in the presence of people he does not know." (Tr. 1160, 1179). His mental health improved again in September and November 2021 (the second and third pages cited by the ALJ), as this period shows the plaintiff enjoyed well-managed medication, reduced anxiety, no opiate cravings, and the ability to visit his uncle and the library. (*See* Tr. 1258–59 & 1299). But only a few short months later in January 2022, the plaintiff relapsed

(fentanyl, cocaine and marijuana) and was hospitalized for suicidal ideations with "thoughts to hang himself or jump in front of a car." (Tr. 1325).

Put into context, the record shows "longitudinal inconsistencies" that support Powell's GAF scores and the remainder of her medical source statement, not the ALJ's conclusions. Powell described the plaintiff's prognosis as a "chronic illness" that would "wax and wane." (Tr. 1365). The Court also notes that Powell checked nineteen symptoms on the Patient Symptoms and Signs checklist, all of which appear in the plaintiff's medical records.[12] (Tr. 1366–67). To the extent the ALJ disagreed with Powell's conclusion that the plaintiff's substance abuse was in remission, the record indicates that the plaintiff was generally not using controlled substances, although he relapsed with cocaine or opiates five times over three years, in October 2019, November 2020, April 2021, December 2021, and January 2022. (Tr. 1051–53, 1210–1212, 1235, 1309, 1325–51).[13]

As for Powell's evaluation of the plaintiff's work-related limitations, the topics—(I) Understanding and Memory, (II) Sustained Concentration and Persistence, and (III) Social

---

[12] These nineteen symptoms were: "appetite disturbance with weight change;" "apprehensive expectation;" "anatomic hyperactivity;" "deeply ingrained maladaptive patterns of behavior;" "difficulty thinking or concentrating;" "easy distractibility;" "emotional withdrawal or isolation," clarifying that he is "afraid to leave [his] house;" "feelings of guilt or worthlessness;" "generalized persistent anxiety;" "hallucinations or delusions" that are "auditory;" "mood disturbance;" "oddities of thought, perception, speech or behavior;" "paranoid thinking or inappropriate suspiciousness;" "perceptual or thinking disturbances;" "persistent disturbances of mood or affect;" "persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation" specifying that he has a "fear of going outside;" "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;" "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once per week;" and "substance dependence" that is "in remission." (*Id.*).

[13] The plaintiff also regularly reported cannabis use. (*See id.*). It is unclear to which drugs Powell's "remission" comment refers, but it is unlikely to be cannabis given that the plaintiff regularly used it.

Interaction—have little to do with the ALJ's description of the plaintiff's "generally intact mental status examinations, his ability to live alone, perform his activities of daily living independently, and his ability to access community resources such as the library." (Tr. 24). As the Second Circuit has made clear, a plaintiff's ability to accomplish daily living tasks outside of work "has no bearing" on the ability to work. *See Rucker*, 48 F.4th at 93 (explaining the plaintiff's "ability to attend counseling sessions—in which she is receiving treatment to alleviate her symptoms—has no bearing on her ability to attend work," because "work is a different, more stressful environment for [the plaintiff] in which her psychiatric triggers are exacerbated by co-worker interaction and the need to respond appropriately to supervision"); *Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) ("There is some evidence that Colgan, a single mother, could to some extent care for her two young children and engage in activities necessary to her own welfare. But we cannot say that these make a treating physician's findings flawed and foreclose an applicant's entitlement to disability benefits."); *c.f. Stacey*, 799 F. App'x at *10 (explaining a claimant "occasionally being in a good mood does not undermine the conclusion that he is severely limited in social interactions"). Grooming, bathing, and doing the laundry are not tasks that take up eight hours each day, as would a full-time job. Indeed, the plaintiff lived alone in isolation from everyone around him, and this isolation was consistent with Powell's conclusion that the plaintiff had an "extreme" limitation when it came to interacting with the public. (Tr. 1179 (7/25/20; "extreme anxiety and panic in public places and in the presence of people he does not know")). The ALJ therefore erred by relying on the few tasks of daily living that the plaintiff could perform.

Because the ALJ failed to support his medical opinion assessments with substantial evidence, his errors are substantive rather than procedural. Therefore, they are inherently harmful and require remand. *See generally Colgan v. Kijakazi*, 22 F.4th at 359 n.3 (explaining an ALJ's

failure to explain the medical opinion determination was a "procedural error subject to a harmless error analysis" but stating "we need not reach the question of whether this procedural error was harmless" because a substantive error necessitated remand); *Shaw v. Chater*, 221 F.3d 126 (2d Cir. 2000) ("A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error.").

### B.    Additional Issues

Because the ALJ's errors regarding the medical opinions form the basis for this recommended remand—and an RFC is dependent in part on a proper evaluation of the medical opinions— the Court does not address the RFC determination here.  On remand, the ALJ must re-evaluate the RFC based on a proper review of the medical opinion evidence.  With respect to the RFC, the ALJ should re-evaluate the evidence in the context of SSR 85-15.  The purpose of this SSR is to "provide a framework for decisions concerning persons who have only a nonexertional limitation(s) of function or an environmental restriction(s)."  SSR 85-15 (S.S.A.), 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857, at *1.  With respect to stress and mental illness in the workplace, SSR 85-15 states:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.  A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

*Id.* at *6.  While SSRs "do not have the force and effect of the law or regulations," they are binding on "all components of the Social Security Administration."  *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984).  The Court surmises that revisiting the RFC with SSR 85-15 in mind might impact

the ALJ's assessment of the vocational expert's testimony, which generally indicated that unscheduled breaks would likely render the plaintiff unemployable. (*See* Tr. 80–82).

### C.    <u>Remand for Further Administrative Proceedings Is Appropriate</u>

While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits, (*see* Pl.'s Mem. at 21), the Court declines to do so. "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). Simply put, there are outstanding issues that need to be resolved by the Commissioner. As such, "[r]emand for calculation of benefits would [] be inappropriate." *Id.* Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling.

### VI.    <u>CONCLUSION</u>

The Court respectfully recommends the plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 18) is **GRANTED in part** and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits. The Court also recommends the Commissioner's motion to affirm that decision (Doc. No. 22) is **DENIED**. It is recommended the case be remanded to the Commissioner to re-evaluate the evidence, revisit steps four and five (and others, if the ALJ deems it appropriate), and conduct further proceedings, if warranted, consistent with this decision.

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or

recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a) & 72; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

It is so ordered this 5th day of August, 2024 at New Haven, Connecticut.

___/s Robert M. Spector_____

Robert M. Spector,
United States Magistrate Judge

26